# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs February 25, 2014

## STATE OF TENNESSEE v. DANNY ADAMS

**Appeal from the Criminal Court for Monroe County**
**No. 09-445     Carroll L. Ross, Judge**

---

**No. E2013-01236-CCA-R3-CD - Filed April 22, 2014**

---

The Defendant, Danny Adams, was convicted by a jury of simple assault. On appeal, he challenges the sufficiency of the evidence for that conviction, including an argument therein of inconsistent verdicts. We have thoroughly reviewed the record on appeal, and although the evidence is sufficient, we must reverse the Defendant's conviction because an incorrect mental state was included in the jury charge. Moreover, we cannot deem the error harmless beyond a reasonable doubt. Accordingly, we reverse the judgment of the trial court and remand the case for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court**
**Reversed and Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Richard Hughes, District Public Defender, and Jeanne L. Wiggins, Assistant Public Defender, for the appellant, Danny Adams.

Robert E. Cooper, Jr., Attorney General and Reporter; Michelle L. Consiglio-Young, Assistant Attorney General; Steven Bebb, District Attorney General; and James H. Stutts, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

This case arises from a June 24, 2009 evening brawl at Hidden Lake Campground in Monroe County. The Defendant and his cohort, Vincent Cole, quarreled with Joshua Anderson that evening, ultimately leading to Joshua Anderson's shooting of both the Defendant and Cole. Thereafter, the Defendant was charged with the criminally negligent

homicide of Cole and the aggravated assault of Anderson. See Tenn. Code Ann. §§ 39-13-102, -212. The Defendant proceeded to trial on August 30, 2012.

The proof at trial revealed the following facts. Thirty-year-old Joshua Anderson testified that he visited Hidden Lake Campground with his wife, Jamie Anderson, on the evening of July 24, 2009.[1] According to Joshua, they arrived at the campground pavilion around 7:00 or 8:00 p.m. to meet with Joshua's uncle, Mark Anderson, and a party with a karaoke machine was in progress. Both Cole and the Defendant were present at the party when Joshua arrived. Joshua stated that he had met both men before, but he did not have a personal relationship with them. He first encountered Cole, amongst a group of other people, as he walked up the ramp to the pavilion.

Joshua stated that, at some point in the evening, he engaged in a conversation with Cole. During that conversation, the Defendant walked over and asked, "Is there a problem here, [Cole]? Have we got a problem?" referring to Joshua. According to Joshua, Cole responded, "No, there ain't no problem." After talking a few minutes longer with Cole, Joshua sat down. Joshua then walked to his car to get a drink, returning through a group of people on the ramp on his way back to the pavilion. This time, "it seemed a little more tense[,]" so he said to Jamie, "We need to get out of here." Joshua described the group as "aggressive" and said that "nobody want[ed] to move to let [him] walk by[.]" He also observed a "razor knife" on the Defendant's side as he passed him. Joshua went to Cole, asking if there was problem because it was not "a comfortable scene." Joshua then told Jamie to walk down the back steps, pretending to go the bathroom, and they would meet at the car and leave.

As Joshua was making his way to the car, the Defendant ran up to him, yelling at him and asking if he had flipped "a bird" at the Defendant. Joshua replied, "No. . . . I'm leaving." By this time, a crowd began to gather according to Joshua, "circl[ing] around [him,]" and Jamie had brought him his .22-caliber pistol because she was "scared" for him. Joshua continued to assert his desire to leave and turned to walk towards his car when the Defendant hit him from behind and knocked him down on the gravel parking area. As Joshua got up from the ground, the Defendant "kept coming towards" him, pursuing him up an incline. In an attempt to thwart the Defendant's efforts, Joshua fired a warning shot into the air and once again stated his desire to leave. According to Joshua, the warning shot stopped the Defendant "for a split second," and Jamie got in between them at that time, pleading with the Defendant to let them leave. The Defendant threatened Joshua with his knife, stating, "I'm going to cut your f--king guts out." The Defendant's then girlfriend,

---

[1] For the sake of clarity, we will refer to the Andersons by their first names or full names. We intend no disrespect.

Lynette Adams, "knocked [Jamie] out from in between" the two men. According to Joshua, that was when the Defendant "tried to cut" him, so he shot the Defendant. Joshua stated that he "was in fear for [his] life, or . . . real bad bodily harm."

Joshua saw that Cole's wife, Sydne Cole, had now grabbed Jamie and placed a knife to her throat. Joshua testified that Cole came "running [at him] with a knife " and was going to "stick [him] in the back," so Joshua placed his pistol under his arm and shot Cole. Joshua believed he had no other option but to fire at the men. At this time, Cole's wife let Jamie go, and the couple proceeded to leave the campground. The couple then drove to Joshua's grandfather's house, which was nearby, and immediately telephoned 911. Joshua waited for the police to arrive that evening to speak with him and turned his weapon over to the police once they arrived. Joshua exercised his right to remain silent when questioned at the county jail later that evening.

On cross-examination, Joshua was asked about the operation of the .22-caliber handgun. He stated that the weapon's magazine held ten bullets. After Jamie brought him the weapon at the campground that evening, he did look to see if a bullet was in the chamber, but he did "take [his] hands to make the action to put a bullet into the chamber[.]" He confirmed that the weapon did not misfire during the altercation and stated that "the cops dropped a round when they [were] unloading it" at his grandfather's house.

Mark Anderson, Joshua's uncle, testified about his observations the evening of July 24, 2009. Mark was responsible for inviting Joshua to the party at the campground pavilion that evening. At the time of the party, Mark was "good friends" with Cole, but he did not know the Defendant. According to Mark, when Cole's "bunch pulled up, they [were] raising hell[,]" "[j]ust ornery[,]" and "[t]rying to pick a fight with anybody they could." While singing karaoke, Mark saw the Defendant "jump[] up" when Joshua was talking to a girl from high school and heard the Defendant say to Joshua, "You got anything to say to her, you can say it to me." At some point in the evening, Mark noticed that Joshua and Jamie were gone. Mark stated that he then "heard two firecrackers behind" him and turned to see his nephew standing in the road with a gun. Mark went to assist Joshua, walking swiftly up the hill to where Joshua was located, and there he met Cole, who "was in [his] face" when he turned around. Mark said to Cole, "You need to leave Josh alone," and then, Mark was "hit in the crotch[,]" causing him to pass out.

Cathy Lusby, who knew both Cole and the Defendant but not Joshua or Jamie Anderson prior to the party, shared with the jury her observations of the brawl that evening. According to Ms. Lusby, Cole and the Defendant arrived at the party about 8:00 p.m. That evening, she heard "a firecracker" and yelling. She looked to see "a whole crowd of people" who were "coming up the hill." She stated that Joshua and his wife were "backing up" the

3

hill being pursued by the Defendant and Cole. According to Ms. Lusby, Jamie was "pulling [Joshua] like up the hill." Ms. Lusby heard Cole telling the Defendant several times that Joshua had a gun and to "[g]et away" from him; however, she did not observe the Defendant or Cole actually back away from Joshua. Ms. Lusby described Joshua's movements, "[H]e would back up and then step forward. . . . Like he, he wanted to maybe go away, but then he wasn't done either[.]" Everyone was starting to get loud at that point, and Ms. Lusby heard shots fired and saw "the women . . . trying to pull the guys off of each other." Cole was shot first, followed by the Defendant, according to Ms. Lusby. Although she saw the gun, she did not see whether Cole had a knife in his hand. After the shooting, the crowd scattered, and the Andersons got into their car and left. Ms. Lusby also did not observe anyone get into a physical altercation with Jamie Anderson that evening. The entire episode last ten to fifteen minutes according to Ms. Lusby.

Cole died from his gunshot wound to his arm pit area, and the Defendant required surgery for his wound to the abdomen. During Cole's autopsy, his blood alcohol level was determined to be .12 percent at the time of his death. Other than the gunshot wound, Cole exhibited "a few fairly minor abrasions of his legs and ankles[.]"

Investigator Douglas Brannon with the Monroe County Sheriff's Department collected evidence at the scene. According to Inv. Brannon, there were approximately ten officers, four Emergency Management Services personnel, and ten bystanders present when he arrived at the campground pavilion. During his search, Inv. Brannon discovered two shell casings, along with one unfired round, scattered around the area. Eyeglasses, a hoop earring, a ball cap, and a large "clump of hair" were also recovered. A matching hoop earring was later retrieved from Jamie Anderson.

Inv. Brannon stated that, when he retrieved the weapon from Joshua after the shooting, there were six rounds in the chamber. The officers were unable to account for one round of the ten-round chamber, and Inv. Brannon opined that another spent round should have been present at the scene because the gun had been fired three times according to witnesses. Inv. Brannon discussed how Joshua's weapon operated, "It's . . . a .22 caliber, semi-automatic pistol, meaning that it self-loads. Once it's loaded to begin with, each time you pull the trigger, it loads itself, ejects the old one and puts a new one in."

Joshua was later photographed at the jail and exhibited "some injuries" in those photographs. Also, some sand and gravel were seen "in the backside of [Joshua's] britches" according to Inv. Brannon. The morning following the shooting, after the investigation had been concluded, the police received a call that a lock-blade knife had been found at the scene. The knife, which was covered by a chair, was retrieved. Blood was present on the knife, and a partial DNA profile of that blood matched the Defendant.

The Defendant testified in his own defense and provided a different version of the events. The Defendant claimed that, as Joshua was coming down the ramp from the pavilion, Joshua ran into him and knocked him against the railing. The Defendant said, "Excuse you, buddy," but Joshua kept walking and did not respond. Shortly thereafter, Cole approached the Defendant inquiring about Joshua, "What's that guy's problem?" The Defendant said, "I don't know. . . . I don't know him." According to the Defendant, Cole sat down beside Jamie Anderson, and Joshua told Cole "to get out of his f--king seat[.]" Cole told Joshua that the seat did not belong to him, but he would get out of it anyway. The Defendant stated that everything settled down at that point.

During this period of reprieve, Jamie went to her vehicle and returned with something in a brown paper bag for Joshua. Joshua pulled the item out of the bag and stuck it in his pants according to the Defendant.

Five minutes or so later, Joshua approached Cole again and "started talking smack[.]" A verbal altercation ensued, but the parties eventually calmed down, appearing to have mended their grievances with one another.

The Defendant said he went to use the bathroom fifteen minutes after that where he encountered Joshua pointing a gun at Cole. The Defendant admitted that he then hit Joshua, who fired at him but missed. The Defendant was yelling at Cole to get the gun when Mark Anderson got in between them and pushed Cole off Joshua. When Cole kicked Mark, Joshua fired at them. The Defendant claimed that Cole was backing away at the time he was shot and that neither of them produced a knife during the altercation. According to the Defendant, Sydne Cole grabbed Jamie after the shooting and threatened to cut Jamie's throat, but the Defendant still never saw a knife.

On cross-examination, the Defendant acknowledged that he had three convictions for passing fraudulent checks, seven for credit card fraud, and one for possessing cocaine for the purpose of delivery. On redirect, the Defendant testified that both he and Cole had a knife like the one found at the scene. However, he claimed that he still had his in his possession at the time of trial.

The Defendant's estranged wife, Lynette Adams, testified for the defense and provided a similar recount of the events as the Defendant. However, she provided one different, important detail from other witnesses; she testified that the Defendant was shot first, before Cole.

Following the conclusion of the proof, the Defendant was acquitted of the criminally negligent homicide of Cole and found guilty of the lesser-included offense of the simple

assault of Joshua Anderson, a Class A misdemeanor. See Tenn. Code Ann. § 39-13-101. Thereafter, the trial court sentenced the Defendant to eleven months and twenty-nine days, to be served on unsupervised probation if the Defendant paid his court costs within two weeks. This appeal followed.

## ANALYSIS

On appeal, the Defendant argues that the evidence is insufficient to sustain his conviction for simple assault. Specifically, he asserts that,

> for the jury to acquit [the Defendant] of both aggravated assault and criminally negligent homicide, the jury must necessarily have rejected the State's theory in this case. If the jury rejected the State's theory that [the Defendant] committed an aggravated assault with a deadly weapon or caused Josh Anderson to shoot and kill Vince Cole, they could not have rationally viewed [the Defendant's] conduct as in furtherance of criminal activity but in defense of himself and Mr. Cole.

The Defendant then engages in a lengthy recount of the trial testimony in an attempt to support his allegation of insufficient evidence, discussing the credibility of the witnesses, the evidence admitted, and the perceived deficiencies in the crime scene investigation. He concludes that "[t]he jury's verdict is simply inconsistent with their other findings and further, unsupported by the proof presented at trial." The State disagrees, stating,

> because the proof permitted a reasonable jury to find that Josh Anderson was in reasonable fear of imminent bodily injury when the [D]efendant hit him and displayed a knife and that the [D]efendant acted either intentionally, knowingly, or recklessly, the jury could find that the elements of assault had been proven.

The State notes that the jury chose to accredit Joshua Anderson's testimony and that inconsistent verdicts will not be disturbed if the evidence is sufficient to sustain the conviction.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all

6

conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Because the Defendant's sufficiency issue also includes an inconsistent verdict argument, we will recap the charges as they were initially presented to the jurors for their consideration. The Defendant was charged with the criminally negligent homicide of Cole and the aggravated assault of Joshua Anderson. Criminally negligent homicide is defined as "[c]riminally negligent conduct which results in death." Tenn. Code Ann. § 39-13-212(a).

> "Criminal negligence" refers to a person who acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-106(a)(4). The aggravated assault charge, of which the Defendant was acquitted, required the State to prove that the Defendant "[i]ntentionally or knowingly commit[ed] an assault as defined in § 39-13-101" and that the Defendant used or displayed a deadly weapon. See Tenn. Code Ann. § 39-13-102. In accordance with Tennessee Code Annotated section 39-13-101(a)(2), a person commits the offense of simple assault, the

7

offense for which the Defendant stands convicted, when he "intentionally or knowingly causes another to reasonably fear imminent bodily injury[.]"[2]

The Defendant's sufficiency argument is two-fold. First, he challenges the credibility of the witnesses, the evidence, and the crime scene investigation. As previously noted, the Defendant gives a detailed review of specific aspects of the testimony and evidence at trial, noting Joshua Anderson's testimony that his wife brought him the gun after she saw an altercation ensuing, the location of the unfired round, the testimony about how the .22-caliber pistol operated, the chaotic crime scene following the shooting, the insignificance of the DNA evidence found on the knife, the lack of injury to Joshua Anderson, the State's inadequate investigation following the shooting, and Ms. Lusby's "rather distant but interesting view of events." He further notes that "there was only one witness[, Joshua Anderson,] who testified that [the Defendant] had a knife and that witness also testified that Vince Cole tried to stab him from behind[,]" leaving this testimony unsubstantiated. The Defendant testified that he and Cole were attacked by Joshua Anderson; however, the jury was free to reject this testimony. Juries are tasked with assessing the credibility of trial witnesses and are generally free to reject, in whole or in part, the testimony of any witnesses. As often stated, it is the province of the jury to assess the credibility of the witnesses, weigh the evidence, and resolve disputed issues of fact. State v. Leach, 148 S.W.3d 42, 53 (Tenn. 2004). In the case at bar, the jury listened to multiple witnesses testify that the Defendant and Cole pursued the Andersons up an incline while the men engaged in a quarrel. There was sufficient evidence to support a conviction that the Defendant intentionally or knowingly caused Joshua Anderson to reasonably fear imminent bodily injury.

Although not stated as a separate issue, the Defendant contends that the jury necessarily rejected the State's theory of the case based upon their verdicts, i.e., the jury's verdicts were inconsistent. However, the Defendant was charged with separate counts dealing with separate victims. When the jury determined that the Defendant lacked the requisite intent that caused Cole's death, i.e., that the Defendant did not act with criminal negligence, the jury could still have properly concluded that the Defendant was guilty of the assault of Joshua Anderson. Moreover, as noted by the State, even if they were inconsistent, inconsistent verdicts have long been upheld in this State. See Wiggins v. State, 498 S.W.2d 92, 93-94 (Tenn. 1973) (holding that "[c]onsistency in verdicts for multiple count indictments is unnecessary as each count is a separate indictment" and must be individually supported by the evidence).

---

[2] The Defendant was not charged with assault by "[i]ntentionally, knowingly or recklessly caus[ing] bodily injury to another[.]" See Tenn. Code Ann. 39-13-101(a)(1).

8

However, we deem it necessary to note a separate error that requires reversal of this case. See Tenn. R. App. P. 36(b) (stating that "[w]hen necessary to do substantial justice, [this] court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal"). In order for this court to find plain error, we consider the following five factors:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and
> (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). Plain error cannot be found unless the record establishes all of the elements of the Adkisson standard. Id. at 283.

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Litton, 161 S.W.3d 447, 458 (Tenn. Crim. App. 2004) (quoting State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990), superseded by statute on other grounds as stated in State v. Reid, 91 S.W.3d 247, 291 (Tenn. 2002)). "A charge should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); Graham v. State, 547 S.W.2d 531 (Tenn. 1977)).

Here, the trial court gave the following instruction on the lesser-included offense of simple assault[3]:

> For you to find the [D]efendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements: the State must have proven (1) that the [D]efendant caused another to be in reasonable fear of imminent bodily injury; and (2) that the [D]efendant acted either intentionally, knowingly or recklessly.

The State notes in its appellate brief that the jury was instructed that they could convict the Defendant based upon a mens rea of recklessness but does not address the issue any further. However, one can only commit reckless assault where there is bodily injury, which was not alleged here. See Tenn. Code Ann. 39-13-101(a)(1) ("A person commits assault who

---

[3] The record clearly establishes what occurred in the trial court.

9

[i]ntentionally, knowingly or recklessly causes bodily injury to another[.]"); see also State v. Goodwin, 143 S.W.3d 771, 776 (Tenn. 2004) (holding that reckless aggravated assault cannot be a lesser-included offense of aggravated assault based upon fearing imminent bodily injury because reckless aggravated assault requires actual bodily injury). Additionally, the comments to section 39-13-101 provide, "Both fear of bodily injury and physical contact must be done intentionally or knowingly to constitute assault; recklessness is not sufficient." Thus, the instruction given was clearly in error. We conclude that a clear and unequivocal rule of law has been breached.

Jury instruction errors of this type are subjected to constitutional harmless error analysis because "[o]nly when the jury is properly instructed can appellate review of the sufficiency of the convicting evidence satisfy the due process safeguard." State v. Cecil, 409 S.W.3d 599, 609 (Tenn. 2013). This requires the appellate court to determine whether a failure to instruct the jury was harmless beyond a reasonable doubt, that is, "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008) (citation omitted); see also Chapman v. California, 386 U.S. 18, 24 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."). When considering this category of error, a reviewing court "should ask whether the flaw in the instructions 'had substantial and injurious effect or influence in determining the jury's verdict.'" Hedgpeth v. Pulido, 555 U.S. 57, 58 (2008) (citing Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (internal quotation marks omitted in original)). As the United States Supreme Court explained,

> Consistent with the jury-trial guarantee, the question it instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand. Harmless-error review looks, we have said, to the basis on which "the jury actually rested its verdict." The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.

Sullivan v. Louisiana, 508 U.S. 275, 279 (1993) (citations omitted).

At the Defendant's trial, the prosecution argued that the Defendant and his cohort, Cole, perpetrated an assault on Joshua Anderson, requiring Joshua to first fire a warning shot, and then to shoot both men in self-defense when they produced knives. By contrast, the Defendant testified that he went to Cole's aid when Joshua pulled a gun on Cole and that

Joshua shot them both.[4] Given the competing theories presented to the jury, we cannot, in our view, say that the error is harmless beyond a reasonable doubt, i.e., that the guilty verdict actually rendered in this trial was surely unattributable to the error. Although the offense of aggravated assault contains the additional element of use or display of deadly weapon, the jury was instructed, properly so, with only the mental states of intent or knowing for that offense and declined to find the Defendant guilty. The instruction for simple assault added the additional mental state of reckless. As such, we are unable to conclude that "the guilty verdict actually rendered in this trial was surely unattributable to the error"; thus, we cannot conclude that the instructional error was harmless beyond a reasonable doubt.[5] Accordingly, plain error requires us to reverse the Defendant's conviction and remand the case for a new trial on the charge of assault, to be accompanied by proper instructions.

## CONCLUSION

In accordance with the foregoing, we reverse the Defendant's conviction for simple assault and remand for a new trial consistent with this opinion.

_____
D. KELLY THOMAS, JR., JUDGE

---

[4] We can think of no incentive for the Defendant to waive the issue for tactical reasons.

[5] A substantial right of the accused has been adversely affected, and consideration of the error is "necessary to do substantial justice."